# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NORTHEASTERN DIVISION

WILLIAM K. TYLER,        )
                                    )
            v.                  )       **Case No. 2:05-0079**
                                    )

MICHAEL J. ASTRUE,        )
**Commissioner of Social Security,**[1]  )

To: The Honorable Thomas A. Wiseman, Jr., Senior District Judge

## REPORT AND RECOMMENDATION

The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Secretary of Health and Human Services denying Disability Insurance Benefits ("DIB") under the Social Security Act.

Upon review of the Administrative Record as a whole, the Court finds that the Commissioner's determination at step five of the sequential analysis that the plaintiff is able to perform his past relevant work is supported by substantial evidence in the record as required by 42 U.S.C. § 405(g).

---

[1]Michael J. Astrue is automatically substituted for his predecessor Jo Anne Barnhart as Commissioner of the Social Security Administration. Fed. R. Civ. P. 25(d)(1).

Case 2:05-cv-00079   Document 16   Filed 03/17/08   Page 1 of 43 PageID #: 55

## I. INTRODUCTION

The plaintiff filed an application for DIB dated April 12, 2001, alleging disability beginning on August 27, 1998.[2] (Tr. 58-62.) The plaintiff was found not disabled in a decision dated May 31, 2001, and the plaintiff was informed of the denial of his claim in a letter stamped June 5, 2001. (Tr.36-37, 40-42). The plaintiff filed a request for reconsideration on July 3, 2001, citing his back condition, knee condition, and associated pain that prevented work. (Tr. 44.) Upon reconsideration, the agency again found that the plaintiff was not disabled in a decision dated July 11, 2001 (Tr. 38-39), and the plaintiff received a notice of reconsideration informing him of the denial of his claim for DIB dated July 12, 2001. (Tr. 45-46.) The plaintiff filed a request for a hearing before an Administrative Law Judge ("ALJ") on August 6, 2001. (Tr. 47.) A hearing was held on March 11, 2003. (Tr. 29-33, 230-58.) The plaintiff received a notice of an unfavorable decision dated April 8, 2004. (Tr. 18-20.) The plaintiff filed a request for review of the hearing decision on April 27, 2004.[3] (Tr. 229.) On March 16, 2005, the plaintiff's attorney

---

[2]The plaintiff initially stated that the date that he was last able to work was June 1, 1998. (Tr. 58.) However, his application was amended shortly thereafter to correctly reflect that the last day he was able to work was August 27, 1998. (Tr. 61.) The interviewer at the disability office contacted the plaintiff's former employer, who supplied the correct date. (Tr. 63.) The plaintiff's employer also reported that the plaintiff made one unsuccessful attempt to return to work in December 1998. *Id*.

[3]The record contains another request for review form and accompanying cover letter dated April 26, 2004. (Tr. 16-17.) However, these documents refer to a claimant other than the plaintiff.

sent a certified letter to the Appeals Council detailing the errors allegedly committed by the ALJ in reaching the decision that the plaintiff was not disabled. (Tr. 223-27.) On April 18, 2005, the Appeals Council denied the plaintiff's request for review. (Tr. 10-12.) After briefly setting aside the earlier action in order to consider additional information, the Appeals Council again denied the plaintiff's request for review on June 8, 2005. (Tr. 6-9.) The ALJ's decision became the final decision of the Secretary when the Appeals Council denied the plaintiff's request for review.

The plaintiff now requests judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g). Before the Court is the plaintiff's motion for judgment on the administrative record and accompanying memorandum (Docket Entry Nos. 10 and 11), to which the defendant has responded (Docket Entry No. 14), and the plaintiff has replied (Docket Entry No. 15).

## II. BACKGROUND

The plaintiff was born on August 11, 1960. (Tr. 58.) He was 38 years old as of his date of alleged onset on August 27, 1998. The plaintiff was first insured for DIB on April 1, 1998, and last insured on June 30, 2001. (Tr. 64-66.) He finished the twelfth grade and subsequently attended the Chem Lawn Tree and Turf School in Rochester, New York. (Tr. 80.) He held a license for pest applicator that expired in 2002. *Id.* His work history

3

primarily included jobs in the pest control/exterminator and lawn care fields from 1984 until his date last employed in 1998. (Tr. 75, 87.) The plaintiff reported that he tried to join the Air Force after high school, but that he failed the physical "due to [his] leg." (Tr. 94.) He stated that the Army and "foestry" [sic] also turned him down. *Id*. The plaintiff had one marriage that ended in divorce in 1991, and he remarried in 1994 and was still married to his second wife at the time of his application for DIB and at the time of his hearing. (Tr. 58, 254.)

### A. Chronological Background: Procedural Developments and Medical Records

The relevant time period during which the plaintiff may claim DIB extends from August 27, 1998, his alleged onset date, to June 30, 2001, his date last insured. Despite this relatively limited time frame, it is appropriate to look at the administrative record in its entirety, including medical records that are outside of the identified time period. Earlier medical history may provide factual background and historical perspective where, as here, the plaintiff suffers an early traumatic injury that has lasting and worsening consequences. Further, where a plaintiff suffers from a chronic impairment, medical evidence subsequent to the date last insured may be probative of the plaintiff's condition prior to the expiration of his insured status. *Ellis v. Schweiker*, 739 F.2d 245, 247 (6th Cir. 1984.).

The plaintiff was injured in a car accident in March 1975 and required right knee surgery involving open reduction (manipulating and setting the fracture following an incision into the overlaying bone and muscle), and the installation of internal fixation hardware. (Tr. 123.) He recovered well until April 1976, when he was involved in a second car accident that again injured his right knee. *Id.* Following this injury, doctors were able to set the fracture without incision and placed the plaintiff in a cast for three months. Upon removal of the cast, the plaintiff was unable to run or maneuver, and he experienced recurring instability and swelling. Finding that the fracture had not healed correctly, on December 30, 1977, the plaintiff underwent right knee surgery involving a bone graft from his right hip and implantation of internal fixation hardware. (Tr. 119, 121-23.) By July 1978, he had almost a full range of motion, no pain or instability, good union, and he was released to normal activity. (Tr. 120.)

In 1995, the plaintiff again experienced complications with his right knee. Dr. Raymond Stefanich, an orthopaedic surgeon, examined the plaintiff on March 16, 1995, in Rochester, New York. (Tr. 158.) Dr. Stefanich noted the plaintiff's history of injuries, including three previous surgeries on the plaintiff's *left* knee carried out by a doctor in Georgia.[4] He noted diffuse tenderness to the right knee, degenerative changes apparent

---

[4]The reference to surgeries to the plaintiff's left knee is likely a simple error. There are no other references to or testimony concerning any surgeries to or problems with the plaintiff's left knee. The doctor was, in all likelihood, referring to three of the many surgeries performed on the plaintiff's right knee.

5

on x-ray, spurring, and other irregularities. He noted tricompartmental degenerative changes to the right knee and stated, "[o]bviously, there is no cure for this." *Id*. He recommended anti-inflammatory drugs and possible surgery to remove the internal hardware. (Tr. 159.) On October 12, 1995, Dr. Stefanich reported continued pain, again noting the "irreparable degenerative changes to the right knee," and that there was no cure for the plaintiff's condition. (Tr. 157.) On October 26, 1995, the plaintiff returned with his wife and agreed to surgery to remove his internal hardware. (Tr. 156.)

The plaintiff presented to Park Ridge Hospital on December 1, 1995, for arthroscopic debridement of his right knee and retained hardware removal. *Id*. The plaintiff was informed that he had advanced degenerative changes and that he may not have good pain relief postoperatively and that preoperative pain might recur. (Tr. 127.) The hardware was removed, degenerative changes (some "extensive") and scar tissue were observed, and the surgeons documented a small tear of the medial meniscus. (Tr. 127-28.) In some areas, extensive degenerative changes were accompanied by loss of the articular cartilage so severe that bone was exposed. (Tr. 128.) Post-operatively, the plaintiff responded well. (Tr. 153-56.) The plaintiff informed his doctors that he was relocating to Tennessee on January 1, 1995, and he was given copies of his medical record. (Tr. 153.)

On April 7 and April 27, 1998, the plaintiff injured his back bending over at work drilling in concrete. (Tr. 150.) Following the second incident, the plaintiff was unable to

6

return to work full time.[5]  He was diagnosed with muscle spasms and sprain and put on

muscle relaxers and anti-inflammatory drugs, but he continued to worsen.  He saw a

chiropractor in May and August but his pain did not improve.  He could not do the

recommended therapeutic exercises due to pain, and the chiropractor told him he could

not help him.  *Id.*

On June 10, 1998, the plaintiff presented to the Cookeville Regional Medical Center

("CRMC") complaining of right calf pain.  (Tr. 141.)  During a back spasm while climbing

stairs, the plaintiff fell and injured his lower right leg.  The plaintiff treated the scrape with

soap, water, and Neosporin, but it became red and inflamed.  *Id*.  He was diagnosed with

cellulitis (an inflammation of the subcutaneous tissue), treated with Keflex, and instructed

to keep the wound clean and dry and ambulate as pain allowed.  (Tr. 142.)

Dr. Thomas J. O'Brien, an orthopedic surgeon, saw the plaintiff on August 17, 1998,

for his back pain and diagnosed lumbar sprain.  (Tr. 150.)  He recommended physical

therapy and released the plaintiff to return to work at maximum medical improvement

with a 0% permanent impairment rating.  *Id.*  The plaintiff was unable to continue at work,

and on August 21, 1998, the plaintiff saw Dr. James Staggs complaining of lower back pain

since April 7, 1998.  (Tr. 175.)  The plaintiff reported seeing a chiropractor and physical

therapist with no relief.  The plaintiff stated that he would like to return to work but had

---

[5]The plaintiff would later enter into a workers' compensation settlement agreement arising out of this incident, discussed *infra*.  (Tr. 67-70.)

significant pain trying to do certain activities such as rolling up hoses. He reported being unable to have intercourse due to the pain. Dr. Staggs noted L1-S1 paraspinal tenderness, and that the plaintiff could bend forward from approximately twelve inches from fingertips to toes, but that backward and side bending and rotation were uncomfortable and painful. Dr. Staggs recommended an MRI and referred the plaintiff to Dr. Jestus. *Id.*

A lumbar MRI performed on August 25, 1998, revealed degenerative disc disease present at L5-S1 with disc space narrowing, as well as a bulging disc. (Tr. 137, 174.) There was no evidence of disc herniation or spinal stenosis. No fractures, malalignment, or other abnormalities were noted. *Id.*

On August 31, 1998, the plaintiff presented to Dr. Joseph Jestus, a neurosurgeon, on referral from Dr. Staggs. (Tr. 151.) Dr. Jestus diagnosed lumbar sprain, citing a history of pain for four months and noting an "essentially negative" MRI scan, although Dr. Jestus described the scan as revealing a disc bulge at L5/S1 . Dr. Jestus was unable to determine the cause or origin of the plaintiff's back pain, speculating that it could be a pulled muscle, torn ligament, or the bulging disc on the MRI. *Id.* Dr. Jestus noted pain in the back and buttocks that was worse with work, and he described the pain as a "severe type of pain." (Tr. 150.) Dr. Jestus recommended anti-inflammatory medications, mild narcotic pain medications, and sleep aids, and that the plaintiff should continue to work. He sent him

8

for three weeks of physical therapy, and noted that he might be a candidate for epidural steroid injections. (Tr. 151.)

The plaintiff began treatment at the Cookeville Therapy Center with Fred Bowen, a physical therapist, on September 3, 1998. (Tr. 210.) The plaintiff presented with lumbosacral spine pain and began a course of treatment, was given a home exercise program, and instructed in proper care of his back. *Id*. During the intake interview, the plaintiff recounted the history of his back injury and treatment. (Tr. 211.) He reported that sitting, standing, walking, and other activities increased his pain, and that he tried to work a few days per week but had increasing pain. He stated that sitting and driving hurt the most. He reported being unable to perform activities of daily living and yard activities. He rated his pain as a 7 out of 10, with his best day in the last month at a 5 and his worst day at a 10. *Id*. The plaintiff demonstrated limitation of unassisted lumbar spine mobility and derangement -3 towards his right side. (Tr. 213.)

On September 16, 1998, Mr. Bowen reported that the plaintiff, after six physical therapy sessions, was having difficulty performing his home exercise program and had to be re-instructed. (Tr. 208.) The plaintiff reported that his pain persisted and was rated at a 6 on a scale of 0 to 10. *Id*.

On September 25, 1998, Mr. Bowen wrote to Dr. Jestus to update him on the plaintiff's therapy sessions. (Tr. 204.) The plaintiff attended regularly and reported

9

decreased pain but continued to complain of pain overall. *Id*. Dr. Bowen recommended the work conditioning program if the plaintiff did not return to work. (Tr. 205.)

The plaintiff returned to Dr. Jestus on September 28, 1998, reporting that his back pain was "minimally better" following three weeks of physical therapy. (Tr. 149.) The physical therapist recommended one to two weeks of work conditioning. *Id*. Dr. Jestus prescribed work conditioning for one week that could be extended for a second week. (Tr. 218.)

In a letter dated October 1, 1998, Mr. Bowen wrote to Dr. Jestus to update him on the plaintiff's progress in the work conditioning program. (Tr. 201.) Mr. Bowen reported that, although the plaintiff had attended on a regular basis, his compliance with the exercise program was suspect because he had to be re-instructed on a regular basis. The results of the plaintiff's validity testing was "equivocal," although Mr. Bowen added that "[t]his does not mean that he has no organic cause for some of his symptoms," and pointed out that he rated his pain at a 9 out of 10. *Id*. Mr. Bowen concluded that the plaintiff showed poor progress in the work conditioning program, and that attempts to increase lifting to over ten pounds had been thus far unsuccessful. (Tr. 203.)

In a letter dated October 5, 1998, Mr. Bowen notified Dr. Jestus that the plaintiff was exhibiting "Inappropriate Pain Behavior" and that he had not improved over the course

of the program. (Tr. 200.) Mr. Bowen recommended that the plaintiff "return to work and get on with his life," and the plaintiff "agreed to try this out." *Id*.

On October 5, 1998, the plaintiff returned to Dr. Jestus following completion of his work conditioning program, reporting little progress. (Tr. 148.) He continued to have pain with activities. Despite Mr. Bowen's report of equivocal test results and recommendation that the plaintiff return to work, Dr. Jestus opined that the plaintiff had a soft tissue injury to the back, but that he was unresponsive to active therapies. He recommended a month of rest and cessation of physical therapy and all other activities that would irritate his back. He referred the plaintiff for epidural steroid injections and called for reassessment in four weeks. Dr. Jestus noted that the plaintiff was very angry and frustrated with his condition and having difficulty coping with his disability, and indicated that he would refer him to a psychologist. *Id*.

On October 14, 1998, Dr. Jestus referred the plaintiff to Dr. George Starkweather at CRMC. (Tr. 135.) The plaintiff presented with lower back pain and reported suffering two on-the-job injuries involving jarring his back when using a concrete drill. The plaintiff reported being unable to work since that time. He related a history of back strain and muscle spasm, and being treated with muscle relaxers, NSAIDs (anti-inflammatories), chiropractic referral, physical therapy, prescription narcotics, and neurosurgical referral. The plaintiff reported that his pain remained "unchanged" in spite of these treatments and

that his days were generally uncomfortable.  Dr. Starkweather referred to his MRI scan as revealing a minimal disc bulge at L5/S1.  The plaintiff had trouble sleeping and had seen "Psychology" for assistance with pain control.  *Id*.  Dr. Starkweather recommended epidural steroid injection and the plaintiff agreed. (Tr. 135-36.)  The injection was administered successfully.  (Tr. 136.)

On October 24, 1998, the plaintiff was seen by Dr. John B. Averitt, Ph.D., who diagnosed an adjustment disorder with depressed mood.  (Tr. 194.)  He noted that the plaintiff had moderate chronic pain and was unable to work as a result of his back injury.  He suggested six additional counseling sessions.  *Id*.  It is unclear whether the plaintiff attended additional sessions.

On October 26, 1998, the plaintiff returned to Dr. Starkweather, reporting a 20-30% improvement in his back pain, ambulating without discomfort, and less sleep disturbance.  (Tr. 133.)  No muscle spasm was observed.  The plaintiff was given another lumbar epidural steroid injection and sent home with advice to initiate work hardening with physical therapy.  Dr. Starkweather noted that the plaintiff was "going to change physical therapists and begin at the hospital."  *Id*.

The plaintiff returned to Dr. Jestus on November 6, 1998, following his first two of three epidural steroid injections.  (Tr. 147.)  He reported pain relief with both injections but that his pain had gradually recurred.  Dr. Jestus noted that the plaintiff had not followed

through with psychological testing that had apparently been recommended. The plaintiff's pain seemed "a little better," and Dr. Jestus recommended a "re-do" of a work hardening routine for one to two weeks followed by a functional capacity assessment. *Id.*

On December 1, 1998, the plaintiff returned to Dr. Jestus reporting worse back pain. (Tr. 146.) Upon the recommendation of the plaintiff's workers' compensation medical case manager, Dr. Jestus agreed to refer him for his third epidural injection and probably a permanent impairment rating. *Id.*

The plaintiff consulted Dr. Leon Ensalada, an occupational and environmental medicine and pain medicine specialist, on December 8, 1998, for a second opinion at the request of Dr. Jestus. (Tr. 190.) The plaintiff recounted his medical history, and related that his back pain seemed worse, *id.*, despite brief periods of improvement following the steroid injections. (Tr. 191.) The plaintiff stated that his symptoms were always present and of varying intensity, and included tingling, pins and needles, weakness, muscle spasm and tightness. *Id.* His pain was aggravated by coughing, sneezing, sitting, standing, and lying down. (Tr. 191-92.) The plaintiff relieved pain with lying down, heat, alcoholic drinks, medications, and walking. (Tr. 192.) The plaintiff's pain interrupted his sleep. The plaintiff reported being able to perform all personal activities of daily living without assistance, including driving, dressing, undressing, personal hygiene, eating, communications and household chores. He also listed his hobbies as gardening, shooting

13

guns, and playing guitar, although it is not clear whether the plaintiff was then actively pursuing those hobbies. The plaintiff was currently taking Daypro (an anti-inflammatory), Sinequan (sleep aid), and Lortab. *Id*.

Dr. Ensalada reviewed medical records relating to the plaintiff's back injury and the psychological evaluation prepared by Dr. Averitt. (Tr. 194.) Dr. Ensalada noted the "unremarkable" August 1998 MRI and the plaintiff's history of physical therapy. *Id*. Dr. Ensalada observed pain behavior during the exam, and diminished active range of motion in the lumbar spine, but no palpable spasms in the lower back muscles. (Tr. 195.) Dr. Ensalada diagnosed the plaintiff with low back pain and opioid (narcotic) dependence, and opined that the plaintiff's problems were "iatrogenic," which is defined as an illness or condition brought about by medical treatment (presumably by the repeated knee surgeries and the plaintiff's dependence upon prescription narcotics). He noted that the plaintiff's exam was "significant for the absence of objective signs of neurologic impairment," and "significant for the absence of objective signs of musculoskeletal impairment." *Id*. Dr. Ensalada went on to note that the plaintiff's prognosis was guarded due to length of time he had been out of work, his self-perception of total occupational disability, and the absence of objective signs of medical impairment. (Tr. 196.) He determined that there was no further necessary or reasonable treatment and recommended that the plaintiff discontinue narcotic pain medication, use doxepin for insomnia, and

14

continue steroid injections to the lower back. *Id*. Dr. Ensalada also determined that the plaintiff was able to return to full time pest control work if he only carried a one-gallon can "doing baseboards and cabinets," with no crawling, bending, or drilling. *Id*.

On the request of the plaintiff's workers' compensation carrier, the plaintiff was seen on February 19, 1999, by Dr. Robert Clendenin for evaluation of lower back pain. (Tr. 198-99.) Dr. Clendenin recounted the plaintiff's April 1998 back injury and subsequent treatments. (Tr. 198.) He noted that the plaintiff was reporting pain in the lower back that was worse with activity, at times quite severe, and relieved by lying down. Examination revealed some tenderness over the lumbosacral junction, pain on flexion with normal extension, mildly positive straight leg raise for back pain only with normal deep tendon reflexes, strength, and sensation in lower extremities. X-rays and MRIs revealed slight L5-S1 disk bulge that did not appear to impinge any neural structures. *Id*. Dr. Clendenin diagnosed the plaintiff with mechanical back pain, resulting in a five percent impairment to the body as a whole, and opined that the plaintiff was at maximum medical improvement. (Tr. 199.) He found that the plaintiff had the ability to lift up to fifty pounds occasionally and twenty pounds frequently with no bending more than ten times per hour. He was prescribed Elavil, a sleep aid, and Dolobid, for pain. *Id*.

The plaintiff entered into a workers' compensation settlement agreement with his former employer, Mid State Termite, Inc., on October 8, 1999. (Tr. 67-70.) The settlement

papers reflect that the plaintiff accidentally injured his low back in the course of his employment (the April 1998 back injuries) and suffered a permanent disability, although the parties to the settlement did not agree on the extent of the disability.  (Tr. 68-69.)  The settlement involved a lump sum payment of $17,245.20 for his impairments plus $5,000 towards future medical expenses, which would remain open for three years.  (Tr. 69.)

The plaintiff again saw Dr. Staggs on October 15, 1999, complaining of right knee pain and discomfort with low back pain "from BWC injection 12-15 months ago."  (Tr. 170.) The plaintiff reported that he was unable to return to work, and that his symptoms were worse at times.  He had bilateral L3-S1 tenderness and increased pain with forward bending and side bending to the right.  Backward bending and rotation were "okay." Tenderness in the right knee was present.  Dr. Staggs recommended right knee x-rays and an MRI of the lower back and prescribed Flexeril and Celebrex for pain.  *Id*.

It was not until over a year later that the plaintiff saw Dr. Staggs again on December 13, 2000, complaining of right knee pain with locking up, popping, and grinding. (Tr. 169.) Dr. Staggs noted low back and right knee tenderness, lack of full range of motion, and significant MCL laxity.  He prescribed Percocet and Relafen and recommended follow-up with Dr. Hollmann.  *Id*.

The plaintiff presented to Dr. Carl Hollmann, an orthopaedic surgeon, at Upper Cumberland Orthopedic Surgery for evaluation of his right knee problems on

16

December 15, 2000. (Tr. 162.) Dr. Hollmann referred to the plaintiff's history with right knee problems and his past and current treatments. He noted tenderness on examination, quad atrophy on the right side, range of motion of 0-90 degrees, and severe arthritic changes apparent on x-ray. The doctor noted: "This is markedly advanced for a 40 year old gentleman," and stated, "we are running out of options at this point." He gave the plaintiff a steroid injection and recommended that he continue on Relafen, a non-steroidal anti-inflammatory. Dr. Hollmann concluded that the plaintiff would need a total knee replacement. On December 19, 2000, in response to the plaintiff's phoned complaint that his medications were not working, Dr. Hollmann discontinued Relafen and called in a prescription for Vioxx, another anti-inflammatory drug used to treat pain. *Id*. On December 29, 2000, the plaintiff returned with "quite a bit" of knee pain, although he reported that the injection had "helped some." (Tr. 161.) Dr. Hollmann again discussed a total knee replacement, although he did not encourage it and left the decision up to the plaintiff. *Id*.

On March 26, 2001, the plaintiff returned to Dr. Staggs complaining of right knee pain, that he was unable to ambulate fifty yards, and that he had pain with standing. (Tr. 168.) Dr. Staggs noted that the plaintiff needed a total knee replacement and referred him to Vanderbilt Orthopedics. He prescribed Ultram, an opioid used to treat moderate to severe pain. *Id*.

17

The plaintiff filed an application for DIB on April 12, 2001, alleging disability beginning on August 27, 1998, his date last employed.[6]  (Tr. 58-62.)

On May 25, 2001, Dr. Robert Burr performed a Physical Residual Functional Capacity ("RFC") assessment for the SSA.  (Tr. 176-83.)  Dr. Burr found that the plaintiff could lift twenty pounds occasionally and ten pounds frequently, stand/walk at least two hours in an eight hour day, sit about six of eight hours, and found that pushing/pulling was unlimited.  (Tr. 177.)  Dr. Burr noted that the plaintiff will need a total knee replacement. *Id*.  He opined that the plaintiff had postural limitations and could only climb, balance, stoop, kneel, crouch, or crawl "occasionally."  (Tr. 178.)  No manipulative, visual, communicative, or environmental limitations were noted.  (Tr. 179-80.)

In a decision dated May 31, 2001, the plaintiff was found not disabled pursuant to the Social Security Act.  (Tr. 36-37.)  The plaintiff filed a request for reconsideration on July 3, 2001, and the Agency again found that he was not disabled on July 11, 2001.  (Tr. 44, 38-39.)  The plaintiff filed a request for a hearing before an ALJ on August 6, 2001.  (Tr. 47.)

On September 27, 2001, Dr. Staggs completed a Disabled Person License Plate and/or Placard application on behalf of the plaintiff.  (Tr. 185.)  Dr. Staggs listed right knee osteoarthritis as the cause of the plaintiff's disability.  *Id*.

---

[6]The plaintiff was injured at work on April 7 and April 27, 1998.  After the April 27 injury, the plaintiff was never able to return to work full-time, but the August 27 date reflects his final day of employment, excluding one final and unsuccessful attempt to return to work in December 1998.  (Tr. 63.)

18

A medical source statement was completed on November 13, 2002, that the ALJ attributed to Dr. Staggs. (Tr. 189.) The defendant appears to dispute whether or not Dr. Staggs truly authored this medical source statement, referring to it at times as "the assessment attributed to Dr. Staggs," and using similar phrasing.[7] *See, e.g.*, Docket Entry No. 14, at 7, 14-15. However, both the ALJ and the SSA attributed the statement to Dr. Staggs, perhaps in reliance upon indicia now unavailable to the parties or the Court, such as the statement in question being provided along with other records received from Dr. Staggs. The signature on the statement, consisting of the initials "G.S.," is consistent with previous examples of Dr. (James G.) Staggs's initialed signature. *See* Tr. 170, 175; *and see* Tr. 185 (full signature of Dr. Staggs). The designation "F.P." next to the signature is an abbreviation for "Family Practitioner," and Dr. Staggs is a family practitioner and the plaintiff's self-described "family physician." (Tr. 190.) The Court is convinced, as were the ALJ and the Agency, that the statement was signed by Dr. Staggs.[8]

_____

[7]The Court also notes that the date the statement was signed is also arguably illegible. (Tr. 189.) However, the Office of Hearing and Appeals index indicates that the correct year is 2002 (Tr. 3), and no one disputes this interpretation.

[8]Additionally, in attributing the statement to Dr. Staggs, the ALJ gave the opinion "treating source" deference and engaged in a careful and reasoned analysis, which is the highest standard the ALJ would have been bound to apply. The Court does not need to address a situation in which, for example, the ALJ wrongly attributed a medical source statement to a non-examining source and gave it less deference than it rated under the applicable rules and regulations.

19

In the medical source statement, Dr. Staggs limited the plaintiff to lifting/carrying less than ten pounds occasionally and frequently, with less than two hours of standing/walking in an eight-hour workday. (Tr. 186-87.) Sitting was limited to less than six hours in an eight-hour workday with periodic sitting and standing to relieve pain or discomfort. (Tr. 188.) Pushing and pulling was limited in the lower extremities due to severe right knee injury. Balancing was allowed occasionally but climbing, kneeling, crouching, and crawling were all limited to never. *Id*. There were no manipulative or visual/communicative limitations noted, and while temperature extremes were limited, all other environmental limitations were unlimited. (Tr. 189.)

**B. Hearing Testimony: The Plaintiff and a Vocational Expert**

ALJ Mack Cherry conducted an administrative hearing in Nashville, Tennessee, on March 11, 2003. (Tr. 230.) The plaintiff was represented by Donna S. Massa, and vocational expert ("VE"), Dr. Kenneth Anchor, also testified. *Id*.

The plaintiff testified that he was born August 11, 1960, and was forty-two years old at the time of the hearing. (Tr. 233.) He had a high school education and received training in the field of chemicals and pest control/extermination work. (Tr. 234.) The plaintiff's last employer was Midstate Termite and Pest Control. (Tr. 235.) During his employment with Midstate, he suffered an on-the-job injury, which resulted in a workers' compensation

20

action that was settled.  The plaintiff attempted to return to work after his injury, last

working in December 1998.  While at Midstate, the plaintiff performed inside pest control

and also did termite work which involved crawling.  His work required that he lift fifty to

seventy five pounds at the most.

Prior to this job, the plaintiff worked in New York for Sissle and Associates.  *Id*.  He

was employed for approximately five years doing extermination (but not termite) work.

(Tr. 236.)  Before that employment, he worked in Florida for Tampa Palms, where he was

the head of the chemical division and he did "fertilization, fungicides, insecticides for

lawns, trees, and turf."  (Tr. 236.)  In that job, he was able to lift "a couple of fifty-pound

bags."  *Id*.  Also while in Florida, the plaintiff worked for a number of other companies in

the capacity of a chemical specialist in lawn care or pest control/exterminating.  *Id*.  The

plaintiff testified that he has done only this type of work for the past fifteen years.  (Tr. 236-

37.)

The plaintiff testified that his primary care physician was Dr. Staggs, and that

Dr. Staggs referred him to specialists to help with his problems, including Dr. Jestus,

Dr. Clindenon, Dr. McKinney, and Dr. Hollmann.  (Tr. 237.)  The plaintiff testified that he

had not returned to work because he is unable to work.  *Id*.  He testified that he cannot

bend, cannot pick anything up, and "can't do anything."  (Tr. 238.) He stated that he feels

"useless."  His knee and back problems affected even his ability to do things around the

Case 2:05-cv-00079   Document 16   Filed 03/17/08   Page 21 of 43 PageID #: 75

home.  The plaintiff related that despite his "good" leg being his left leg, the left leg was beginning to suffer from compensating for the right leg.

The plaintiff testified that he had seven or eight surgeries on his right knee.  He has had hardware put in and hardware taken out, as well as arthroscopic surgery. Dr. Hollmann told the plaintiff that he had the knee of an 80 year old man and suggested total knee reconstruction.  *Id*.  The plaintiff testified that Dr. McKinney recommended that he wait to have the surgery due to his young age.[9]  (Tr. 239.)  The plaintiff testified that he has a ninety degree bend in his right knee, pain all around it, that he cannot put his full weight on it, and that he usually leans on his left leg for support.  *Id*.  The knee pain was constant and varied in intensity.  (Tr. 240.)  The plaintiff related that he kept the knee elevated with ice packs or transferred from heat to ice, and he stated that taking medications seems to help.  He described his knee pain during the hearing at a nine point five.  *Id*.  Narcotic pain medication provided some relief, perhaps reducing pain from a nine to a six and a half or a seven.  (Tr. 241.)  The plaintiff reported being unable to squat or crawl.  *Id*.

---

[9]Dr. McKinney was a part of the Upper Cumberland Orthopedic Surgery group along with Dr. Hollmann.  (Tr. 160.)  The plaintiff testified about what both Dr. McKinney and Dr. Hollmann told him, but the Court's recitation of medical facts includes only references to Dr. Hollmann because of the way in which the records were reproduced, i.e., on letterhead, but only occasionally signed by a specific doctor, and in all instances, by Dr. Hollmann.  (Tr. 160-64.)

The plaintiff next testified about his lower back pain, describing it as "intense" and "non-stopping." (Tr. 242.) The plaintiff stated that exercise did not help and that the pain was piercing. His back problems were limited to normal backaches until his accident at Midstate. He rated his current back pain at a seven or eight. Standing, walking, or sitting for any period of time made his pain level higher. *Id*. Pain medication provided some relief but did not seem to work as well with his back pain. (Tr. 243.)

The plaintiff testified that his home activities were severely limited in that he could no longer mow the law, weed the yard, cook, or even help with the cooking, which is an activity that he used to love. *Id*. The plaintiff related that his wife was "doing everything" around the house. (Tr. 244.) He had difficulty putting on his shoes and pants. He testified that his relationship with his wife had changed and that he had "moved to the back bedroom." Driving and shopping were difficult, and driving was limited to maybe twice a week at distances not greater than fifty miles round trip. His wife and father did the shopping and other chores. *Id*. His social activities were limited to eating at a restaurant or going to church, though it was difficult to sit through the services. (Tr. 245.) The plaintiff related that he had given up his hobbies of hunting, fishing, sports, and yard work. He had difficulty sleeping due to pain in his back and knee. The plaintiff had problems waking up in the morning and getting his knee to bend and work correctly. *Id*. The plaintiff was "restless" and had tried different medications to help him sleep. (Tr. 246.)

23

The plaintiff stated that he had to lie down "[j]ust about all day, every day." He testified that he was most comfortable lying down flat with ice packs and heating pads, and that he now used a cane frequently. *Id*.

The ALJ asked the plaintiff a series of questions. The plaintiff answered that he lived in a mobile home with his wife and a little dog. (Tr. 247.) The step up to the mobile home gave him a problem. The plaintiff testified that he had a handicapped parking permit. The plaintiff testified that he found extermination to be the "easiest job for him," despite trying construction for awhile. When working in lawn maintenance, the plaintiff did a lot of driving and used a push spreader to spread chemicals and fertilizers on the lawns. *Id*. At Tampa Palms, the plaintiff testified that he was a department head and supervised other workers. (Tr. 248.) As an exterminator, he did not supervise others. *Id*.

The plaintiff testified that he had not sought vocational rehabilitation to find other work. (Tr. 249.) He was currently taking Percocet and Tylox, but that he tried to get by without taking medication, although recently he had been taking medication daily. He experienced only slight side effects from the medication, such as constipation. *Id*. The plaintiff again discussed his knee operations, guessing that he had procedures in 1975, 1976, 1978, 1980, 1985, 1993, and one the previous June or July to remove spurs. (Tr. 250.)

Case 2:05-cv-00079   Document 16   Filed 03/17/08   Page 24 of 43 PageID #: 78

Following high school, the plaintiff attempted to join the Air Force and become a pilot.  *Id*.  He was rejected after his physical.  (Tr. 251.)  He also tried to be a Marine but testified that they told him he was handicapped.

The plaintiff testified that he tried to do physical therapy exercises every day as best he could.  He also testified that the weather affected him.  *Id*.  Cold, rain, wet, snow, and hot affected both his back and knee.  (Tr. 252.)  The plaintiff stated that, as compared to the same time last year, his condition was "probably worse."  He did not have to use the cane as much last year.  He gave up hunting three or four years ago.  *Id*.  He also gave up working on the lawn about that time.  (Tr. 253.)  He could not ride a riding mower, having tried the previous year, but the vibration made it unbearable.  The plaintiff admitted that he smokes about a half a pack a day and drinks occasionally.

Dr. Anchor testified that the plaintiff's prior work should be categorized as exterminator or pest control technician, and this work was medium and skilled.  (Tr. 255.)  Lawn maintenance work was medium, semi-skilled work.  The ALJ asked the VE to consider a hypothetical person forty years of age with a high school education, background and experiences as described by the plaintiff, limited to light work.  The person could stand and walk for no more than six hours of an eight hour day with a sit-stand option, limited in the lower extremities, no ladders, ropes, or scaffolds, no kneeling, crouching or crawling and only occasionally climbing stairs or ramps, balancing, stopping or bending.  The

Case 2:05-cv-00079   Document 16   Filed 03/17/08   Page 25 of 43 PageID #: 79

person should additionally avoid environmental factors like heat, dampness, and vibrations, and hazardous machinery or unprotected heights (in consideration of the plaintiff's medications).

The VE opined that such a person would not be able to perform the plaintiff's past relevant work or transferable work. However, a person with those limitations could perform a number of light and sedentary unskilled and semiskilled jobs. *Id*. Examples included quality control clerk, inventory clerk, cashier, storage attendant, supply attendant and customer service clerk. (Tr. 256.) These jobs were all at the light level and there were more than 19,000 such jobs in Tennessee, and roughly a million of these jobs nationally. Using the same criteria at the sedentary level, Dr. Anchor listed jobs such as table worker, pricing clerk, timekeeping clerk, telemarketing clerk, credit authorizer and telephone quotation clerk. In Tennessee, there were more than 14,000 such jobs. *Id*.

If the plaintiff were limited to standing and walking for two hours out of an eight hour day and lifting no more than ten pounds, he would be limited to sedentary jobs (Tr. 257), including the sedentary work already described. Factoring in a moderate limitation in maintaining attention and concentration in deference to pain and discomfort, one job would be eliminated, subtracting about 400 jobs but leaving the rest. If the limitation were severe with respect to pain and discomfort, the VE testified that all jobs would be precluded. *Id*. The VE further opined that, if the difficulties described by the

26

plaintiff were severe, chronic, and unresponsive, full-time work in a conventional setting could not be satisfactorily performed. (Tr. 258.) At the conclusion of the VE's testimony, the ALJ noted that based on Dr. Staggs' November 13, 2002, medical source statement, the plaintiff's RFC "would be consistent with less than sedentary work." *Id.*

## III. THE ALJ'S FINDINGS

The ALJ issued an unfavorable decision on April 8, 2004. (Tr. 21-28.) Based on the record, the ALJ made the following findings. (Tr. 27-28.)

1.  The claimant met the nondisability requirements for a period of disability and disability insurance benefits set forth in Section 216(i) of the Social Security Act and was insured for benefits through June 30, 2001, but not thereafter.

2.  The claimant has not engaged in substantial gainful activity since August 27, 1998.

3.  The claimant has the following severe impairments: degenerative joint disease of the right knee, and degenerative disc disease.

4.  These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.  The claimant's allegations regarding his limitations are fairly credible for the reasons set forth in the body of the decision.

6.  The claimant has the residual functional capacity to lift and/or carry 10 pounds; sit for a total of about 6 hours in an 8 hour day; stand and/or walk for a total of about 2 hours in an 8 hour day; periodically alternate sitting and standing to relieve pain or discomfort; limited

27

ability to push and/or pull with the lower extremities; never climb ladders, ropes, or scaffolds; occasionally climb stairs or ramps, balance, stoop, or bend; never kneel, crouch, or crawl; avoid extremes in temperature, dampness, wetness, humidity, vibration, jars, jolts, hazardous machinery, and unprotected heights.

7.     The claimant is unable to perform his past relevant work (20 CFR § 404.1565).

8.     As of June 30, 2001, the claimant was a younger individual (20 CFR § 404.1563).

9.     The claimant has a high school education (20 CFR § 404.1564).

10.    The claimant has no transferrable skills from any past relevant work (20 CRF § 404.1568).

11.    Although the claimant's exertional limitations did not allow him to perform the full range of sedentary work, using Medical-Vocational Rule 201.28 as a framework for decision-making, there were a significant number of jobs in the national economy that he could have performed prior to June 30, 2001.

12.    The claimant was not under a "disability," as defined in the Social Security Act, at any time prior to the date last insured, June 30, 2001 (20 CFR § 404.1520(f)).

The plaintiff filed a request for review of the hearing decision on April 27, 2004.

(Tr. 229.)  The Appeals Council denied the plaintiff's request for review on June 8, 2005.

(Tr. 6-9.)

## IV. DISCUSSION

### A. Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching his conclusion. 42 U.S.C.A. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases). The Commissioner's decision must be affirmed if it is supported by substantial evidence, even if the evidence could also support another conclusion. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*). A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the

29

ALJ's determination. 42 U.S.C.A. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that he is not engaged in "substantial gainful activity" at the time he seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b) and 416.920(b)). A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that he suffers from a "severe impairment." A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.* (citing 20 C.F.R. §§ 404.1520(c) and 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple

Case 2:05-cv-00079   Document 16   Filed 03/17/08   Page 30 of 43 PageID #: 84

instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." §404.1521(b). The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C.§ 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. *Id.* (citing 20 C.F.R. §§ 404.1520(d) and 416.920(d)). The plaintiff may establish that he meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent him from doing his past relevant work, he is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered

relevant.  *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989).  If the plaintiff fails to carry this burden, he must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that he is unable to perform his prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in the national economy.  *See, e.g., Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).  To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform.  *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983) (upholding the validity of the medical-vocational guidelines "grid" as a means for the Commissioner of carrying his burden under appropriate circumstances).  It remains the plaintiff's burden to prove the extent of his functional limitations.  *Her*, 203 F.3d at 391.  Even if the plaintiff's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the plaintiff can perform, he is not disabled.[10]  *Id.  See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

_____

[10]This latter factor is considered regardless of whether such work exists in the immediate area in which the plaintiff lives or whether a specific job vacancy exists or whether the plaintiff would be hired if he applied.  *Ragan v. Finch*, 435 F.2d 239, 241 (6th Cir. 1970).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

### B. The Five-Step Inquiry

In this case, the ALJ resolved the plaintiff's case at step five of the five-step process. (Tr. 28.) At step one, the ALJ found that the plaintiff successfully demonstrated that he had not engaged in substantial gainful activity since the alleged onset date of disability of August 27, 2004. (Tr. 27.) At step two, the ALJ found that the plaintiff suffered from the severe impairments of degenerative joint disease of the right knee and degenerative disc disease. At step three, the ALJ determined that the plaintiff's impairments did not meet or medically equal one of the listed impairments in Appendix 1, Suppart P, Regulation No. 4. *Id*. At step four, the ALJ found that the plaintiff could not perform his past relevant work. (Tr. 28.) However, at step five, the ALJ concluded that, despite the plaintiff's impairments and resulting limitations, a substantial number of jobs still existed that the plaintiff could have performed prior to the expiration of his date last insured of June 30, 2001. *Id*.

Case 2:05-cv-00079   Document 16   Filed 03/17/08   Page 33 of 43 PageID #: 87

### C. The Plaintiff's Assertions of Error

The plaintiff alleges two grounds for reversal in his motion for judgment on the administrative record. First, the plaintiff asserts that the ALJ erred in rejecting the opinion of Dr. Staggs, the plaintiff's family physician. Pl.'s Br. at 6-7. Second, the plaintiff alleges that the ALJ erred in "rejecting" the plaintiff's complaints of disabling pain.

### 1. The ALJ did not err in rejecting the opinion of Dr. Staggs.

The plaintiff alleges that the ALJ erred in rejecting the opinion of Dr. Staggs, the plaintiff's primary treating physician. Pl's Br. at 6-7. The ALJ described the medical records provided by Dr. Staggs, including a medical source statement dated November 2002. (Tr. 23-26.) The medical source statement is a crucial piece of evidence for the plaintiff, as the ALJ opined that the statement described limitations that would prevent even sedentary work, rendering the plaintiff entirely disabled according to his treating physician. (Tr. 26.) Other assessments by other sources of record contained fewer restrictions resulting in a less limiting picture of the plaintiff's health. The plaintiff asserts that the ALJ erred in not relying more fully upon the medical source statement completed by Dr. Staggs. The ALJ gave this assessment "little weight . . . as it pertains to the period prior to June 30, 2001." (Tr. 26.)

34

Although there are many standards to which the ALJ must adhere in assessing medical evidence supplied in support of a claim, generally speaking, greater deference is usually given to the opinions of treating physicians than to those of non-treating physicians. *See, e.g., Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007). This is commonly called the treating physician rule. *Id.* (citing other authority). Due to the nature of the treating physician relationship, these physicians are thought to supply "a detailed, longitudinal picture of [a plaintiff's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone." 20 C.F.R. § 416.927(d)(2). The opinion of the treating physician as to the nature and severity of the plaintiff's impairments will be accorded controlling weight so long as it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and "not inconsistent with other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

Although the ALJ is not always bound by the opinions and assessments of treating physicians, he must nonetheless consider and weigh them, and give reasons for rejecting them. *See generally Schaal v. Apfel*, 134 F.3d 496, 503 (2d Cir. 1998) (discussing the treating source rule). Social Security regulations and well-settled case law require the agency to "give good reasons" for disregarding the medical opinion of a treating physician. 20 C.F.R.§ 404.1527(d)(2); *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987).

In this case, the ALJ analyzed the records provided by Dr. Staggs, as well as those physicians to whom Dr. Staggs referred the plaintiff.  The ALJ cited to office visits in 1998, discussed the results of an MRI that Dr. Staggs ordered, detailed the plaintiff's visits to referral physicians, cited to another office visit in 2000, discussed subsequent referrals, and finally discussed an office visit in March 2001.  (Tr. 23-25.)  The ALJ provided specific analysis of Dr. Stagg's 2002 medical source statement.  (Tr. 26.)  The ALJ concluded that the assessment was not supported by Dr. Staggs' treatment records or the record as a whole for the period prior to June 30, 2001, the date the plaintiff was last insured.[11]

First, the medical source statement was completed at a time fairly remote from the expiration of the plaintiff's insured status: one year and five months elapsed between the expiration of the plaintiff's insured status and the completion of the assessment.  Although such remote evidence can be relevant, especially when the plaintiff's condition is chronic, in the context of determining the specific issue of the plaintiff's eligibility for benefits during this limited time frame, the ALJ correctly noted that the statement was provided well over a year after the plaintiff's last insured date.  The ALJ merely placed the evidence

---

[11]The ALJ commented that, "[l]ike many treating physicians, [Dr. Staggs] appears to feel that if claimant cannot do past work which was very demanding then he is unable to work."  (Tr. 26.)  If true, this attitude may be at least partially explained by physicians' relative familiarity with the workers' compensation system, which does focus more on the plaintiff's current job and his ability to return to that type of work.  And in this case, there was a significant issue with respect to the plaintiff's on-the-job back injury and a resulting workers' compensation claim.

36

in its proper context as less probative than it might have been because it referred to the plaintiff's condition at a stage nearly a year and a half after the expiration of the plaintiff's insured status. The plaintiff's chronic knee and back problems would be expected to worsen as the plaintiff aged and time passed; therefore, it is to be expected that the evaluations of the plaintiff's health would grow steadily worse. The ALJ correctly focused on the medical records pertaining specifically to the time period in question, prior to June 30, 2001, and he analyzed the November 2002 medical source statement and gave credible reasons for awarding it little weight. He cited to other evidence in the record that supported his conclusion, and, even though a different conclusion could have been reached, the ALJ did not run afoul of the treating source rule. The ALJ's conclusion with respect to the November 2002 medical source statement specifically, and the medical records of Dr. Staggs generally, is supported by substantial evidence.

**2. The ALJ did not err in discounting the plaintiff's complaints of disabling pain.**

The plaintiff alleges that the ALJ erred with respect to evaluating the plaintiff's subjective complaints of pain. Pl.'s Br. at 7. The ALJ found the plaintiff to be "fairly credible," but nevertheless found that his allegations regarding his pain and limitations were out of proportion to the objective findings. (Tr. 26.) The credibility of the plaintiff with respect to his pain is an extremely important part of the plaintiff's proof of disability

37

in this case. The VE testified that if the plaintiff's symptoms were both as described and "severe" and "chronic," they would preclude all work, thus resulting in a finding of disability under the Act. (Tr. 257-58.)

The ALJ is charged with evaluating the credibility of the plaintiff at the hearing, and the ultimate decision as to credibility rests with the ALJ. The ALJ's credibility finding is entitled to deference "because of the ALJ's unique opportunity to observe the claimant and judge [his] subjective complaints." *See Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) (internal citations omitted). However, "[i]f the ALJ rejects the claimant's complaints as incredible, he must clearly state his reasons for doing so." *Wines v. Comm'r of Soc. Sec.*, 268 F.Supp.2d 954, 958 (N.D. Ohio 2003) (citing *Felisky*, 35 F.3d at 1036). Social Security Ruling 96-7p emphasizes that credibility determinations must find support in the record, and not be based upon the "intangible or intuitive notion[s]" of the ALJ. 1996 WL 374186 at *4. If a plaintiff's complaints with respect to symptoms are not supported by objective medical evidence, the ALJ must make a determination based on consideration of the record as a whole, including lab findings, the plaintiff's complaints, information provided by treating physicians and other relevant evidence. The ALJ must explain his credibility determination such that both the plaintiff and subsequent reviewers would know the weight given to the plaintiff's statements and the reasons for that weight. *Id.*

Both the Social Security Administration and the Sixth Circuit have enunciated guidelines for use in analyzing a plaintiff's subjective complaints of pain. *See* 20 C.F.R. § 404.1529, *Felisky v. Bowen*, 35 F.3d 1027, 1037 (6th Cir. 1994). While the inquiry into subjective complaints of pain must begin with the objective medical record, it does not end there. The Sixth Circuit in *Duncan v. Secretary of Health and Human Services*, 801 F.2d 847 (6th Cir. 1986), set forth the basic standard for evaluating such claims.[12] The *Duncan* test has two prongs. The first prong is whether there is objective medical evidence of an underlying medical condition. *Felisky*, 35 F.3d at 1039. The second prong has two parts: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition, or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain. *Id.* This test does not require objective evidence of the pain itself. *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3rd Cir. 1984)).

There is objective medical evidence of underlying medical conditions: the plaintiff has suffered both knee and back injuries for which he has been treated on an ongoing basis, and specifically within the period he was insured for disability benefits. Therefore, the first prong of the *Duncan* analysis is satisfied. The second prong is far more problematic,

---

[12]Although *Duncan* purportedly only applied to determinations made prior to 1987, the Sixth Circuit has since held that *Duncan* continues to apply to determinations made after 1987. *See Felisky*, 35 F.3d at 1039 n. 2.

however, since several physicians specifically found that the plaintiff's objective symptoms did not appear severe enough to produce the amount of pain alleged and/or that the plaintiff appeared to be exhibiting inappropriate pain behavior, especially with respect to his back problems. There was also a diagnosis of narcotic pain medication dependence, which may indicate medication-seeking behavior, such as exaggerating reports of pain.

Cases involving a plaintiff's subjective complaints of pain are very difficult. The ALJ must consider the objective medical evidence, observe the plaintiff during the hearing, and determine the weight he believes the plaintiff's subjective complaints merit. So long as the ALJ follows the required procedures and engages in a fair and sufficiently specific analysis, his decision must be upheld, even if a reviewing court looking solely at the administrative record might conceivably reach a different conclusion.

The ALJ found the plaintiff's complaints "fairly credible." (Tr. 25.) A finding of "fairly credible" may seem ambiguous, in that it is not immediately clear whether the ALJ partially believed all of the plaintiff's complaints or whether he completely believed some of the plaintiff's complaints. In reading the relevant portion of the ALJ's opinion in its entirety, however, it appears that the ALJ found that the plaintiff's complaints about his knee problem were credible to the extent that his knee condition and resulting pain impacted his daily activities to some degree, but that his other complaints of disabling pain, particularly his back pain, were not credible.

40

The ALJ believed that the plaintiff's right knee problems reduced his ability to stand and/or walk and that these difficulties were substantiated by the plaintiff's use of a cane and his having acquired a handicapped parking permit. The extent of the plaintiff's knee problems was well-documented by the objective medical evidence of record, culminating in the recommendation by a specialist that he undergo a total knee replacement. However, the ALJ concluded that the objective findings prior to June 30, 2001, did not support a level of disabling pain such that the plaintiff was precluded from all work. The ALJ stated that the plaintiff "feels he is unable to work as he can no longer do the work he had performed in the past," but reiterated that this is not the end of the inquiry under the Social Security Regulations. In the next paragraph, the ALJ stated that "the knee problem is not so much disabling as limiting." [13]

It is evident that despite his acceptance of the severity of the plaintiff's knee condition and resulting pain and limitations, the ALJ did not credit the plaintiff's complaints of pain with respect to his back problem. Specifically, the ALJ cited to the physical therapist's notation of "inappropriate pain behavior," during work conditioning for his back problem and Dr. Ensalada's conclusion that there were "no objective signs of neurological or musculoskeletal impairment that would provide the basis for the degree

---

[13]Although the ALJ was discussing the plaintiff's treating physician's assessment of the plaintiff's knee pain when he made this remark, this statement by the ALJ is illustrative of his overall assessment of the plaintiff's knee problem.

of pain alleged."[14] (Tr. 26.) Although the plaintiff frequently mentioned his back pain to his various physicians, and there is evidence that the plaintiff injured his back on the job in April 1998, the objective medical evidence never revealed any physical conditions capable of producing the alleged degree of disabling pain beyond a slight disc bulge with no signs of nerve involvement. Dr. Staggs recommended an MRI on the plaintiff's lower back in October 1999, but there is nothing in the record to indicate whether the plaintiff obtained this test, and only passing references to "low back pain" in Dr. Staggs's patient notes taken after that point. (Tr. 170, 169, 168.) Although the plaintiff subsequently saw a specialist about his knee (Tr. 162), there is no evidence that he sought any further treatment for his back. Dr. Staggs listed only "right knee osteoarthritis" when he filled out the application for a disabled license tag for the plaintiff in September 2001, a date just past the expiration of the plaintiff's insured status in June of that year. (Tr. 185.)

Therefore, under the second prong of *Duncan*, the objective medical evidence with respect to the plaintiff's back neither confirms the severity of the alleged pain nor establishes a condition of such severity that it could be reasonably expected to produce the alleged pain. The ALJ engaged in all of the requisite analysis. Under the relevant rules, regulations, and case law, he properly determined that the plaintiff's subjective complaints

---

[14]This finding directly addresses the second prong of the *Duncan* analysis. Dr. Ensalada also noted the plaintiff's "self-perception of total occupational disability." (Tr. 196.)

Case 2:05-cv-00079   Document 16   Filed 03/17/08   Page 42 of 43 PageID #: 96

were not entirely credible, and he assessed the plaintiff's disability accordingly. Therefore, the ALJ did not err, and his decision is supported by substantial evidence and should be affirmed.

## III. RECOMMENDATION

For the above stated reasons, it is recommended that the plaintiff's motion for judgment on the record (Docket Entry No. 13) be DENIED.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of service of this Report and Recommendation, and must state with particularity the specific portions of this Report and Recommendation to which the objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed. 2d 435 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

JULIET GRIFFIN
United States Magistrate Judge

43